IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 28, 2001 Session

## STATE OF TENNESSEE v. JAMES A. MELLON

**Direct Appeal from the Criminal Court for Knox County**
**No. 64113B    Mary Beth Leibowitz, Judge**

---

**No. E1999-01505-CCA-R3-DD**
**September 19, 2002**

---

The defendant, James A. Mellon, pled guilty to first degree felony murder and especially aggravated robbery and waived his right to a trial by jury. As part of the plea agreement, the State agreed to recommend concurrent sentences on these charges of life imprisonment with the possibility of parole and twenty-five years imprisonment, respectively, in exchange for the defendant's agreement to testify truthfully and consistent with his previous statement at the trials of his codefendants. Thereafter, the defendant refused to testify as required by his plea agreement, instead, moving to withdraw his guilty pleas. That motion was denied, the State withdrew its sentencing recommendation, and a sentencing hearing was held. The jury, at the sentencing hearing, found the statutory aggravating circumstance that the defendant had previously been convicted of a felony involving violence to the person and sentenced the defendant to death. For the conviction of especially aggravated robbery, the defendant was sentenced to a consecutive term of twenty-five years imprisonment. He then filed a timely appeal. Following our review, we affirm the judgments of the trial court and the imposition of the death penalty.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, and Tim S. Moore, Newport, Tennessee (on appeal); Brandt Davis and Leslie M. Jeffress, Knoxville, Tennessee (at trial), for the appellant, James A. Mellon.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Marvin S. Blair, Jr., Assistant Attorney General; Randall E. Nichols, District Attorney General; and Robert L. Jolley, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In his appeal, the defendant raises the following issues for our review:

I.   The evidence presented in its entirety and as contained in the record was insufficient as a matter of law to support a sentence of death:

A.   Capital punishment is not proportional to the defendant's culpability in the death of Robert Scott Loveday, and its imposition would constitute cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution and by Article I, Section 16 of the Tennessee Constitution;

B.   The imposition of capital punishment in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime; and

C.   The imposition of capital punishment in this case is disproportionate to the penalty imposed in similar cases, considering the defendant.

II.   The jury failed to properly consider and weigh the mitigating evidence against the aggravating factor found.

III.   The trial court erred in refusing to grant defendant's motion to strike from the State's notice of aggravating circumstances that the defendant had a previous felony conviction involving the use of violence to the person.

IV.   The trial court erred in refusing to allow the defendant to withdraw his guilty pleas:

A.   The trial court did not allow the defendant to withdraw his guilty pleas, although they were, in effect, uncounseled pleas and there were fair and just reasons why the pleas should have been withdrawn; and

B.   The trial court erred when it did not allow the defendant to withdraw his guilty pleas and proceed to trial, on the basis of the State's failure to disclose Brady v. Maryland material.

V.   The State failed to make full disclosure pretrial of exculpatory evidence.

VI.   The trial court erred in denying the defendant's motion to continue the sentencing hearing in order that the defendant's expert

-2-

could evaluate medical test data not made available until the first day of the hearing.

VII. The trial court erred in failing to grant the defendant's challenge to the constitutionality of capital punishment:

A. Death imposed by electrocution, or by any means, is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Tennessee Constitution;

B. Tennessee Code Annotated section 39-13-204 does not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for capital punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution;

C. Tennessee Code Annotated section 39-13-204 does not sufficiently limit the exercise of the jury's discretion because, once the jury finds aggravation, it can impose capital punishment no matter what mitigation is shown, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution;

D. Tennessee Code Annotated section 39-13-204 mandatorily requires the jury to impose capital punishment if it finds the aggravating circumstances outweigh the mitigating circumstances, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution;

E. Tennessee Code Annotated section 39-13-204 does not inform the jury in specific terms of its ability to impose a life sentence out of mercy, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution; and

F. Tennessee Code Annotated section 39-13-204 prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution and Article 1, Sections 8, 9, 10, and 16 of the Tennessee Constitution.

## PROCEDURAL HISTORY AND FACTS

### Pleas of Guilty as to First Degree Felony Murder and Especially Aggravated Robbery

The events which resulted in the defendant's being sentenced to death began the evening of August 23, 1997, in Knox County. The first criminal episode in which the defendant was involved resulted in a "best interest" plea of guilty on January 8, 1998, in Case No. 64114-A to the aggravated robbery of Matthew Miller, a Class B felony. See North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). On February 12, 1998, the trial court sentenced the defendant to twelve years imprisonment based upon the following facts presented to the court:

> MR. JOLLEY: Your Honor, the State's proof in this case would show the following: From the testimony of the witnesses listed on the indictment, the State would show that on August the 23rd of 1997, a little after 11:00 o'clock, that Matthew Miller was leaving his work at Lowe's, 5431 Clinton Highway, here in Knox County.
>
> That while he was in the parking lot he was approached by a car that ha[d] several males in it.
>
> One of these males got out of the car, approached him, and asked for a light.
>
> That he would identify this male as James A. Mellon.
>
> That as he looked for a lighter Mr. Mellon drew a silver handgun, put it to his head, and demanded his wallet and car keys.
>
> And Mr. Miller handed over these items.
>
> That Mr. Mellon then got back into the vehicle, and that the vehicle fled the scene.
>
> That his wallet contained $40.00 and other personal items.
>
> Of course, his car keys were also taken.
>
> All of these events occurred in Knox County, Tennessee.

THE COURT:  Anything you would like to add to that stipulation of proof, sir?

MR. DAVIS:  Your Honor, there is one thing I would like to add.

I would, for the record, state that proof that we would be confronted with at trial, we are not agreeing to any elements of that, particularly, except only with regard to what Mr. Mellon did, as far as putting the gun to the victim's head.

THE COURT:  You are agreeing to that?

MR. DAVIS:  No, we are not agreeing to that.

THE COURT:  You are not agreeing to that?

MR. DAVIS:  Everything else that the General has cited is stipulated.

THE COURT:  That is, that Mr. Mellon was at the scene?

MR. DAVIS:  Yes.

THE COURT:  All right.

MR. JOLLEY:  Your Honor, we would state, that in addition to that, that the testimony of Mr. Miller and the testimony of Darryl Johnson, of the Knox County Sheriff's Department, showed that on August the 26th, 1997, that Mr. Mellon, after being fully advised of his Miranda warnings, gave a statement admitting that he was the person who had pulled the gun on Mr. Miller at this time, and robbed him.

MR. DAVIS:  Your Honor, I would also disagree with that version of what the statement says.

I don't believe that the statement that Mr. Mellon gave ever indicated that he held a gun to Mr. Miller's head, or pointed a gun in any way at Mr. Miller.

We dispute that.

THE COURT:  I will take the State's stipulation of what it would seek to prove at trial as a stipulation with the objections that you've noted.

-5-

I will otherwise accept the plea of Mr. Mellon.

During the submission hearing, the defendant was advised of the effect of the plea of guilty to aggravated robbery as to the other pending cases:

MR. JOLLEY: Your Honor, if we might, we would ask the Court to specifically advise Mr. Mellon that this conviction may be used as an enhancement factor if the State were to seek the death penalty or life without parole against him.

THE COURT: I thought I had done that, but I will do that much more specifically.

I think that is important for him to understand.

MR. DAVIS: For the record, we have, I've discussed that at length with Mr. Mellon.

You may want to inquire of this.

But he does understand that.

THE COURT: Mr. Mellon, you understand the conviction in this case can, can be used by the State, –

MR. MELLON: Yes, ma'am.

THE COURT: – before the jury to seek life without parole in case number 64113, or a sentence of death in case no. 64113?

Do you understand that, sir?

And that's an effect of a conviction here today, and, and even though you have entered an Alford plea there will be a conviction?

MR. MELLON: Yes, ma'am.

The defendant was also indicted for the especially aggravated robbery and felony murder of Robert Scott Loveday which occurred shortly after the aggravated robbery of Matthew Miller, and which resulted in imposition of the death penalty. Trial was originally set in the Loveday case in June 1998. The State filed its notice of intent to seek the death penalty on May 15, 1998. Trial was rescheduled to begin on October 12, 1998. On October 9, 1998, pursuant to a plea agreement, the

defendant entered guilty pleas to first degree felony murder and especially aggravated robbery in the Loveday case.[1]  The prosecutor explained the defendant's pleas of guilty as follows:

> MR. JOLLEY:  Your Honor, in case number 64113, Mr. Mellons [sic] will be entering a plea of guilty to the second count of the indictment, which charges first degree murder by means of felony murder, and to the fourth count of the indictment, which charges especially aggravated robbery, a class A felony.
>
> The recommendation in this case will be as follows:  That sentence be reserved in this matter.  That Mr. Mellons [sic] agrees to testify truthfully for the State in any proceeding involving this incident, consistent with the prior statements that he gave to the members of the Knox County Sheriff's Department.  That should Mr. Mellons [sic] comply with his agreement, that the State would be recommending at the time of sentencing, that he receive a sentence of life with parole on the second count –
>
> THE COURT:  With the possibility of parole.
>
> MR. JOLLEY:  Yes.  On the second count of the indictment.  That that sentence would be served consecutively to the sentence that Mr. Mellons [sic] had previously received in case number 64114.  And that a sentence be imposed in the fourth count of the indictment, that is, concurrent with the sentence in the second count of the indictment.
>
> THE COURT:  In what amount?
>
> MR. JOLLEY:  We have no agreement as to a specific time.
>
> THE COURT:  So, it will be Judge sentencing at that point on that count?
>
> MR. JOLLEY:  Yes, Your Honor.  Yes, Your Honor.
>
> Your Honor, we would–

---

[1]There appears to be some question as to the actual date of filing of the request for acceptance of plea of guilty and the order accepting the pleas.  Although both documents bear a file stamp date of "October 8, 1998," the record reflects discussion, between counsel and the court in reviewing the plea form during the hearing on the motion for withdrawal of the pleas, that the date of the plea form "probably should be the 9th."  In addition, the order accepting the pleas was signed by the trial judge and "entered" on "October 9, 1998," the date the submission hearing was held.

THE COURT: That it would be agreed that it would be concurrent, is that what I just heard?

MR. JOLLEY: Concurrent with the second count of the indictment, Your Honor, for an effective sentence of, of life with the possibility of parole, plus twelve years, or twelve years, since he's already been sentenced, plus life with the possibility of parole.

THE COURT: Is Mr. Mellon in the fourth count a range I offender for the purposes of the sentencing?

MR. JOLLEY: He is for the class A felony, Your Honor.

THE COURT: Okay.

The defendant and his attorney then responded to the State's announcement:

THE COURT: Is that the agreement, Mr. Davis?

MR. DAVIS: Your Honor, that is the agreement.

THE COURT: All right.

Mr. Mellon, would you please stand, sir, and raise your right hand to be sworn.

(Mr. Mellon was so sworn.)

THE COURT: Have a seat, please, sir.

Mr. Mellon you've heard the announcement of the Attorney General.

Is this what you understood the agreement to be, sir, and is that the agreement you wish me to approve at this point, insofar as it is an agreement?

MR. MELLON: Yes, Your Honor.

THE COURT: Let's go over it.

First, do you understand, sir, that you are entering a plea of guilty in the second count of the indictment to felony murder, first degree

murder, by means of felony murder, in effect, as you know, the State had requested the death penalty in this case, the recommended sentence, however, is life with the possibility of parole. It is not a promise of parole but you certainly would become eligible for parole and would go up for parole. And that would be served consecutively to the sentence you've received already in 64114.

In the fourth count of that indictment you would be pleading guilty to especially aggravated robbery, wherein you are a range I standard offender, and the range of punishment for that is fifteen to twenty-five years.

There is no agreement. It would be a sentence that I would impose, and make a decision as to what the sentence would be. But it would be agreed that that would be a sentence concurrent with the felony murder sentence.

Do you understand that so far, sir?

MR. MELLON: Yes, Your Honor.

THE COURT: And do you understand, sir, that until . . . we've got to the point of testimony, or conclusion of the cases of the co-defendants, sentencing will be reserved, and you will wait for sentence, and it is agreed further that you will testify truthfully and consistently with the statements that you previously made?

Do you understand all that, sir?

MR. MELLON: Yes, Your Honor.

In addition to being orally advised during the submission hearing that the plea agreement required his testifying against his codefendants, the request for acceptance of guilty plea also sets out this condition with the following handwritten language:

Defendant agrees that he will, if called upon, testify truthfully in any other proceeding in connection with this incident. Said testimony will be consistent with the statements defendant made to Knox County Sheriff's Department officers.

Sentencing in this case is reserved.

A handwritten correction to this statement, substituting the word "incident" for the word "indictment," bears the initials of the defendant and both defense counsel.

The court accepted the pleas and sentencing was reserved pending the defendant's truthful testimony as a State's witness in any proceedings involving these offenses, consistent with the defendant's prior statements to members of the Knox County Sheriff's Department. If the defendant complied with the agreement, the State would, in exchange, recommend a sentence of life with the possibility of parole on the felony murder conviction, with the sentence on the especially aggravated robbery conviction to be served concurrently. These sentences would be served consecutively to the twelve-year sentence imposed for the aggravated robbery conviction in Case No. 64114-A.

The parties stipulated to the proof as follows:

> MR. JOLLEY: Your Honor, the stipulated proof in this case would show from the testimony of witnesses listed on the indictment, that, on August the 24th of 1997, a little after midnight, that the defendant and three other individuals, Mr. Earnest Rodgers, and Mr. Anthony "T-Bone" Jones, and Mr. Davis Jones, pulled into a Cone Station where an individual by the name of Robert Scott Loveday was using a telephone. That these individuals approached Mr. Mellons, (sic) and Mr. Rodgers approached Mr. Loveday, that Mr. Rodgers held a gun to Mr. Loveday's head, that Mr. Mellons [sic] also held a gun to Mr. Loveday, and demanded money from him. And that Mr. Loveday was in the process of taking his money out. That at the time he was taking his money out Mr. Anthony Jones came up, took the gun away from Mr. Mellons [sic] and shot Mr. Loveday. [T]his testimony would show that after this incident occurred that Mr. Mellons [sic] and these other individuals left the scene. That they were subsequently arrested, and Mr. Mellons [sic], after being asked about this incident, gave statements to the Knox County Sheriff's Department, in which he admitted his participation, and the summary of the facts are which I gave.
>
> The proof would also show that he talked to an individual named Edward Beeler. [D]uring the course of his talk with Mr. Beeler, after this incident occurred, Mr. Mellons [sic] made statements in which he said that he was the person who killed Mr. Loveday. That he was killed because he did not have any money.
>
> It would be stipulated that all these events occurred in Knox County, Tennessee.

THE COURT: With the correction that Mr. Mellon's correct last name is M E L L O N.

MR. JOLLEY: It is, it is Mellon, Your Honor. I did say Mellons. It is Mellon.

THE COURT: Is there anything that you would like to add to any of that stipulation, counsel, or corrections you want to make?

MR. DAVIS: No, Your Honor.

**Motion to Withdraw Guilty Pleas**

On December 17, 1998, approximately two months after his pleas of guilty to first degree felony murder and especially aggravated robbery, the defendant filed a *pro se* handwritten "Motion for the Withdrawal of Counsel" as to each trial counsel, seeking to have both relieved because neither was "competent to handle his case." Subsequently, as to each trial counsel, the defendant filed a *pro se* typed "Motion for the Withdrawal of Counsel." These latter motions were dated December 31, 1998, and one motion had a handwritten notation that "[t]his was mailed Jan. 11 of 1998 because of holidays," while the other recited that it was mailed "on Jan. 11 of 1999," which would have been the correct year for both motions. The typed motions were filed on January 13, 1999, by the criminal court clerk. The two typed motions were almost identical, as were the handwritten motions, although one of each set bore the name of different counsel. In brief, each motion alleged that respective trial counsel were "not and [had] not been competent to handle [the defendant's] case and that, [t]his [had] violated all [his] rights to [a] fair trial," had violated an enumerated disciplinary rule and an ethics opinion, and recited that the defendant had filed malpractice claims against both counsel for "violating all [the defendant's] constitutional rights and for Professional Negligence and for violating the code of Professional Responsibility." The motions sought to have new counsel appointed before the defendant was "to go to trial." These motions were denied on January 19, 1999; and, on that same day, the trial court continued the sentencing hearing from February 22 to March 1, 1999.

On January 19, 1999, the same day that the *pro se* motions to dismiss appointed counsel were denied, counsel filed a motion asking that the defendant be allowed to withdraw his pleas of guilty.[2] The affidavit of counsel, attached to the motion, sets out the reasons for the request:

---

[2]The motion, while referring to the defendant's "plea of guilty," alleges that the same conditions existed both as to the pleas to felony murder and especially aggravated robbery. Accordingly, we presume that the request was to withdraw both pleas.

1. I am counsel for James Mellon and was present in Court and signed the Plea of Guilty executed by the defendant on October 8, 1998.[3] Sentencing was reserved in this case.

2. Prior to the entry of this plea the defendant had expressed to both his trial counsel his reluctance to testify against any co-defendants in this or any pending cases, as he was afraid of what might happen to him in prison if he were labeled a "snitch" as the result of such testimony.

3. The defendant continued to express this reluctance to testify on the morning of October 8, 1998, although he was willing to otherwise accept the offer made by the State. Upon being advised the plea offer would be withdrawn by the State if not accepted that morning, the defendant met further with the defense investigator and later with both defense counsel and agreed to accept the plea agreement which he executed and which was accepted by the Court.

4. The undersigned, having been advised Mr. Mellon had been placed in protective custody immediately upon his return to Brushy Mountain Penitentiary, on October 23, 1998, went to the prison and met with Mr. Mellon. Prior to entry of this plea Mr. Mellon had been working in the prison, was in the general population, and had experienced no problems.

5. On October 23, 1998, Mr. Mellon advised the undersigned that, because of the publicity following his plea whereby the media announced in the newspaper, on radio and on TV that he had agreed to testify against his co-defendants, there had been talk within the prison by other inmates which resulted in his being placed in protective custody and isolated from the general population.

6. The undersigned, when he questioned prison authorities at Brushy Mountain, was advised this was true and that they feared reprisals against Mr. Mellon; hence the protective custody.

7. The undersigned was also advised by Mr. Mellon that, following his plea, he had experienced direct physical contact and had a conversation with his co-defendant, Anthony "T-Bone" Jones, at Brushy Mountain Penitentiary. Although he did not divulge the content of this conversation, the undersigned believes Mr. Mellon

---

[3]The plea agreement was executed on October 9, 1998.

actually was, or at least felt, threatened by Mr. Jones. Mr. Mellon has, on at least one prior occasion, been physically assaulted by Mr. Jones while in Knox County Jail.

8.  Counsel is advised and Mr. Mellon is aware that Mr. Jones has assaulted at least one other co-defendant in these cases, resulting in the hospitalization of that individual, and that he has also made threats against other individuals involved in this case. This Court has, on several occasions, also observed the behavior of Mr. Jones and his unsettling behavior in Court.

9.  For the foregoing reasons Mr. Mellon advised the undersigned on October 23, 1998, that he was seriously considering not to testify against anyone as he had agreed to do in his plea agreement. This decision was finally made by Mr. Mellon and directly conveyed by him to Gen. Bob Jolley and Lt. Darryl Johnson at a meeting with them and both trial counsel on the day his co-defendant, Ernest "E" Rogers, was set for trial.

10. Counsel requests that this Affidavit be attached to and made part of the Motion to Withdraw Plea of Guilty filed by the defendant, James Mellon.

On January 19, 1999, the day of its filing, a hearing was held on counsel's motion to allow the defendant to withdraw his pleas of guilty. The trial court first noted that the defendant had filed a letter, addressed to the district attorney general, asking that he be permitted to withdraw his pleas of guilty. The text of the undated letter is as follows:

I have had some time to think, and due to my two attorney[s] has [sic] more[] or less pressured me into this deal for themselves, and not me; or the fact that I to [sic] have a family to think of. I am writing to you in good-standing, and would like to say if you would come, and talk with me I would be willing to give you, and your office the truth of this case, and all that you need to get your convictions. I will await your response.

The defendant testified at the hearing:

THE COURT: Mr. Mellon, would you please stand sir and raise your right hand to be sworn?

(Whereupon, Mr. Mellon was so sworn.)

-13-

THE COURT: Mr. Mellon, I am not going to ask you about any of the facts of this case, in terms of what happened on the date in question and that kind of stuff.

What I need to know, sir, is, whether or not you the attorneys have informed me that on the day of Mr. Rogers' trial, when you were brought here, you informed both your attorneys and the Attorney General that you would not testify in that matter.

Is that correct?

MR. MELLON: Yes, ma'am.

THE COURT: And I take it that . . . you understood that that would breach the agreement that you had made with the State regarding sentencing in this case?

MR. MELLON: I would like to say something.

I under, I did not understand that I was to testify against all co-defendants.

I thought it would be Anthony, Anthony Jones, only.

So, I did not, I misunderstood the agreement at that point.

THE COURT: Assuming that it is as to each co-defendant, do you still understand that, do you still state that you would testify or not testify?

MR. MELLON: Yes, ma'am.

THE COURT: Are you telling me you will not testify against any of the co-defendants?

MR. MELLON: Yes, ma'am.

THE COURT: Do you understand by telling me that you've breached this agreement?

MR. MELLON: Yes, ma'am.

THE COURT:  Do you understand, sir, that as a result of breaching the agreement, if the Court finds that you have breached the agreement, and I think I have to make that finding, after talking to you and hearing what the attorneys say, that you are subject to one of two things happening?

Either the Court ordering a sentencing hearing in which you would be subjected to the possibility of a sentence of death, or a sentence of life without parole.

Or the sentence which you had previously agreed to, which was life with the possibility of parole.

That if you . . . if that should occur those things may happen.

If the Court finds that you would be tried, that the plea agreement be withdrawn and that you be retried, then you are still subject to all of those various possibilities.

And the agreement made with the State is gone.

Do you understand that, sir?

MR. MELLON:  Yes, ma'am.

THE COURT: You are telling me now that you will not testify, am I correct?

MR. MELLON:  Yes, ma'am.

THE COURT:  Have you discussed this matter with Mr. Davis and Mr. Jeffress?

MR. MELLON:  Yes, ma'am.

Later, the defendant testified, in response to questioning by his counsel, as to why he wanted to withdraw his pleas of guilty:

Q  Okay.

Can you tell the Judge why you want to withdraw your plea?

A   [F]rom the very beginning of this procedure I pled not guilty upon the charges that I'm charged with, and I continued to ask the question, would I take the plea that was offered, and I kept saying, "No," I didn't want to take the plea.

And then, come October the 9th, I believe, my lawyer, Bryant [sic] Davis said, "Talk to me," and I told him, "No," I didn't want to take the plea.

So he said, "Okay," and so argued a continuance.

So here comes Mike Cohan and, Broom, when my lawyer wasn't present and asked me the same question.

And I told him, "No," I did not want to take a plea.

And that I wanted to go to trial.

And then, Mike kept saying, "Well, you're going to get the death penalty if you don't take the plea agreement."

And then I said, "Well," I said I wanted to take it.

And I feel like that I was pressured into taking the plea because in the very beginning I said, "No," until they came and asked me the same question after I said, "No."

I got so aggravated that I said, "Yes" to the plea agreement.

But during the plea agreement, when, the Judge was reading it off to me in Court I did not understand that I was to testify against all my co-defendants.

THE COURT:  Okay.

Q   Did you give us any reasons before you pled as to why you did not want to take the plea offer?

A   For one, I didn't want to be labeled as a snitch in prison.

And two, in prison people like that get killed.

And three, I never grew up to, you know, to tell on people.

I feel like my life would be threatened if I was to testify.

Q Has your life, or your physical body been threatened at all?

A No, not at this point.

Q What happened when you left here, after October the 9th?

A I was on, I got back to Brushy on October the 14th, and, automatically on my return they locked me down on administrative lock down, which is protective custody, because there were rumors going around Brushy that some people were going to kill me.

THE COURT: Now, when was this, Mr. Mellon?

After you pled –

THE WITNESS: October the 14th. Yes, ma'am.

THE COURT: Okay.

Q How long did you spend in protective custody?

A 33 days, until I saw the Review Board and they reclassed me and sent me to Northeast.

Q At some point while you were at Brushy Mountain did you meet up with "T-Bone" Jones?

A [Y]es, sir.

Q And what happened?

A Well, we was talking, and I told him that I wasn't going to testify.

Q All right.

Did he seem pleased? Angry? At that statement by you?

A No. He didn't act like, you know, he's just like, "That's cool," you know. That's about all he said.

-17-

Following the presentation of proof and arguments by respective counsel, the trial court made a lengthy review of the defendant's allegations and the proof at the hearing, declining to allow the defendant to withdraw his pleas of guilty:

> Mr. Mellon, when he entered this plea, was asked by me whether he was guilty, and he responded he was.
>
> He now says he does not feel that he is guilty of the offense, and that the plea agreement was under duress, as he's described.
>
> But the Court feels that the duress that Mr. Mellon is feeling now is duress that occurred after this plea agreement.
>
> . . . .
>
> I don't think he's given me a fair and just reason to withdraw his plea, and I am going to require his plea to stand, which raises the next question.

The trial court then determined that the defendant was entitled to have his sentences determined by a jury, following the presentation of proof.

## Capital Sentencing Hearing

Edward Allen Beeler, testifying as the State's first witness, said that he had known the defendant for three or four years. The afternoon following the murder, as he and the defendant were swimming, the defendant told Beeler of the events of the previous night:

> Q  Tell us about that, please.
>
> A  When I went to pick him up to go swimming and, when I got there he kept telling me he had something to tell me.
>
> And I asked him what it was and he said, "I killed this boy last night."
>
> And I –
>
> Q  He said, "I killed this boy?"  [emphasis in original]
>
> A  Yes, he did.
>
> Q  Did he tell you anything else?

-18-

A   Yeah.... [H]e said, he said, "We was out robbin' last night," and he said, "and we rode up on this boy," and he said, "and he didn't have no money or nothin' except for a watch and a dollar." And he said, "And I shot him," and he said, "I seen the blood," and he said, "it popped me up and I shot him again."

Q   Did he tell you where it happened?

A   He just told me it was at a phone booth somewhere in west Knoxville.

The defendant told Beeler he had been drinking and smoking crack cocaine at the time of the murder. Beeler described the defendant as excited about killing someone, although the defendant said he was still hung over after being released from detoxification that morning. Beeler stated he did not believe the defendant's story until he heard about the murder on the news the next morning. Beeler's mother encouraged him to report what he knew to authorities. On the morning of August 25, 1997, Beeler gave a statement concerning the matter to a detective in the sheriff's department.

During cross-examination, Beeler admitted that, at the time of his testimony, he was incarcerated for an aggravated robbery conviction and also had been convicted for aggravated burglary and theft. He said that he had not believed the defendant because he did not think the defendant "was capable of doing something like that." During redirect examination, he said that he was neither seeking a reward nor expecting to "get out of prison" in exchange for testifying.

The State's next witness was Brad Park, a crime scene technician for the Knox County Sheriff's Department, who testified that he had been called to the scene of the Loveday shooting, the Cone Station on Kingston Pike in Knox County, during the early morning hours of August 24, 1997. A series of photographs which he had taken were introduced through him. He said that he had located and photographed two nine-millimeter spent cartridge cases, "one in the rear driver's side seat, and one on the passenger's rear back seat."

Martha Phillips, the Knox County Criminal Court Clerk, testifying from the records maintained by her office, said that the defendant had been convicted on February 12, 1998, for the offense of aggravated robbery, in case number 64114-A, receiving a sentence of twelve years. According to the judgment, the offense had occurred on August 23, 1997.

Matthew Miller, the victim in the aggravated robbery which occurred at approximately 11:00 p.m. on August 23, 1997, and resulted in the defendant's prior conviction, identified the defendant as the man who had robbed him and testified that the defendant " had stuck [a gun] to my head and told me to give him my wallet and keys." Miller said he had $40 in his wallet.

Captain Darryl Johnson of the Knox County Sheriff's Department, investigating the Loveday murder, interviewed the defendant in the early evening on August 25 and again on the morning of

August 26, 1997. Audiotape recordings of the defendant's statements were played for the jury, as were two statements taken by Captain Johnson from codefendant Anthony Jones. During the playing of each tape, each juror was supplied with a transcript of that tape. A nine-millimeter handgun and Loveday's watch were recovered from a closet at the home of Anthony Jones. During cross-examination, Johnson affirmed that a knife was found at the crime scene. He agreed that a crime scene photograph appeared to show a knife at the scene but did not recall ever seeing the knife itself.

Following the testimony of Captain Johnson, the State rested its case in chief.

The defendant's half-sister, Angelia Cunningham, testified that she had been aware of the defendant's drug and alcohol abuse since his early teenage years. She said the defendant's drug habit "was almost like a every day thing." She and the defendant lived with their mother in the Western Heights housing project for thirteen years. The area was overwrought with drugs and violence, which worsened as she and the defendant grew up. When the defendant turned 13, his attitude changed, and he began sneaking out of the house and running around. She described the defendant as a follower who was easily influenced by others. She said that he had tried to kill or hurt himself in various ways.

Jackie Burgess, a records clerk at Brushy Mountain Prison, testified that the defendant had been cited for two nonviolent violations of prison policies since his incarceration, both occurring on October 6, 1998. She said that, according to their records, he had been placed in protective custody on October 16, 1998, after a newspaper reported that the defendant had "plea bargained for life with parole instead of death in exchange for testimony against [his] co-defendants." She said that, to the best of her knowledge, he had not requested to be put into protective custody, but that "as [an] institution we thought that that could be a problem for him later." The defendant remained in protective custody until November 23, 1998, when he was transferred to another institution.

Dr. Claude Renee Valesco, an associate professor of pathology at the University of Tennessee, testified that he performed the autopsy on the victim's body. The autopsy revealed that the victim was struck by two bullets, both of which were recovered. One bullet entered the left chest area and was recovered from the lower right back; the other entered the victim's left arm, traveled across the chest, exited the right armpit, and then went into the right arm. Both shots were "very damaging," and either could have been fatal. The victim would have lost consciousness within a matter of several minutes, probably less, due to the lack of blood flow to the heart.

Kathy McKee testified that she first met the defendant when her father and the defendant's mother briefly dated. McKee had met the defendant's father but said that he was not around the family. She had known the defendant for fourteen years and had visited him in prison. She estimated the defendant had used alcohol "probably two, two days a week" since he was 14 years old. She also said that the defendant began using marijuana at the age of 14. He had a reputation in the community as a nonviolent person. The day after the murder, McKee visited with the

defendant, who appeared as if "he had lost his best friend." He was sad and depressed and asked where something bad would be reported in the newspaper.

Virginia Williams, the defendant's mother, testified that the defendant was born on December 4, 1975, and she and his father were together until he was 13 months old. His father then came in and out of the defendant's life two or three times a year. The defendant had difficulty learning in school and failed the second or third grade and the ninth grade twice. The defendant was transferred to Oak Hill Center at the age of 10 or 11 because of a learning disability. He was later sent to Cape Cods, apparently a juvenile facility, because of truancy problems. He also was sent to Overlook for testing and to the Helen Ross McNabb Center. At the age of 16 or 17, he was sent to Cumberland Hall by the juvenile court system for drug rehabilitation. The defendant was diagnosed with attention deficit hyperactivity disorder ("ADHD"). Williams did not observe her son using drugs or alcohol and did not find out about this until he told her at the age of 14 or 15.

Williams testified that she raised the defendant after his father left. While she worked, the defendant attended Boys Club at times and later stayed by himself. She described Western Heights as a "concentration camp" where "[y]ou needed to stay to yourself most of the time." The defendant did not get into any serious trouble there but was involved in auto theft as a teenager. In 1992, she swore out a petition in juvenile court stating that she could no longer control the defendant. The morning after the murder, the defendant's father brought him home from detoxification, and the defendant appeared to be depressed. She recalled that he told her several times that day that he loved her. When she visited the defendant in prison, he hung his head down in sorrow.

Former Knoxville Patrol Officer John Hankins testified that at about 12:45 a.m. on August 24, 1997, he observed a car commit a traffic offense as it was leaving an apartment complex on Western Avenue. Two white males were in the front seat, and two black males were in the backseat. Hankins activated his blue lights and siren and attempted to make a traffic stop, but the car continued. Near the College Homes housing project, the two black males jumped from the car, which continued onward. Officer Hankins followed the car, which eventually stopped. He apprehended the defendant and the driver, David Jones. The defendant was cited for public intoxication and taken to detoxification for the night. Although the defendant and David Jones reported that the two black males who had earlier fled from the vehicle had been trying to rob and kill them, they did not mention the night's robberies or murder.

In his testimony, the twenty-three-year-old defendant provided additional information as to his background. At the time of the Loveday killing, he was unmarried and had a young son. He always found it hard to pay attention in school, was often truant, and failed the sixth grade before dropping out in the ninth grade. He periodically worked as a house painter. He began drinking alcohol at age 12, which behavior escalated to a daily habit as a teenager. His drug use began with marijuana at age 9 and by the time he was 15 years old, he was using crack cocaine and later morphine. He was "out on the streets sixty-three days in '97, and . . . drunk every day." He was in an alcohol and drug rehabilitation program at Cumberland Hall for nine months in 1993 and stayed off drugs and alcohol for approximately six months after his release. He then began socializing with

his old friends and began drinking again. He had several head injuries during his youth, once injuring his head on a steel pole and, another time, running into a lifeguard stand which knocked him unconscious. His criminal record included auto theft, credit card fraud, possession of a weapon, two counts of reckless endangerment which were reduced to misdemeanors, driving offenses, and criminal impersonation, but no violent crimes. He had not seen his father in two years at the time of the sentencing hearing. His father had not visited him in prison. As a child, he mostly saw his father on birthdays and holidays. His stepfather raised him for six or seven years, and they had a good relationship. His problems began at age 12 when he began running around with older crowds "who had always been in trouble with the law."

The defendant testified that in August 1997, the month when the instant offenses occurred, he was 21 years old and lived with his mother in Fountain City. On August 23, he had been drinking and doing crack cocaine. That afternoon, David Jones picked him up to go riding in Jones' car. The two then picked up Anthony "T-Bone" Jones (no relation to David Jones), Ernest Rogers, and Joshua Shaw. They drove around for a time, smoking marijuana, and Anthony Jones displayed a gun. Rogers also displayed a .38 caliber revolver. The group purchased liquor, of which the defendant estimated he drank half of a bottle before they continued driving to Clinton Highway. In the Lowe's parking lot on Clinton Highway, the defendant observed Matthew Miller sitting in a nearby car under a large street lamp. The defendant was the only person who exited Jones' vehicle, and he did not cover his face when he approached Miller and asked him for a light. The defendant then "showed" Miller his gun and told Miller to give him his money and wallet. He testified that he pled guilty to the aggravated robbery of Matthew Miller because he had "committed a crime."

After the Miller robbery, they continued driving, first to the Christenberry area and then towards west Knoxville. The defendant testified he was "probably very intoxicated" by this time. In Farragut, they drove to a Cone gas station just off Kingston Pike. The station was closed, and a young man, Robert Scott Loveday, was using the pay phone outside. David Jones and Anthony Jones remained in the vehicle. The defendant and Rogers, armed with guns, exited the car, intending to rob Loveday. They approached Loveday as he sat in his car using the phone, and the defendant ordered him to turn over his money. As Loveday began emptying his pockets, Anthony Jones got out of the car. The defendant testified that he saw what he believed was a knife come out of Loveday's pocket but, before he could react, his gun was grabbed out of his hand and shots were fired. Loveday was still sitting in the driver's seat of his car when two shots were fired. The defendant denied shooting the victim, saying he had intended only to rob Loveday, just as he had robbed Miller, but never intended to harm him. He explained that he had given two differing statements when first questioned about the murder because he was afraid, but the last statement he gave was truthful.

The defendant said that, after the shooting, he had talked to Edward Beeler because he "had to talk to somebody. It was on my mind. And, you know, I couldn't keep it inside because I was hurting." At the time, he thought that Beeler had been "doing more than" drinking, and had used morphine "because he kept nodding out." He said he told Beeler "that someone had been shot, to

watch it on the news, but [ ] did not tell him that [he] had shot no one [sic], or who had been shot."

In December 1997, as both were incarcerated, he and Anthony Jones were placed in the same holding cell. Jones "smacked" him, and the two fought. The defendant said he has thought about the murder every day and felt remorseful and sorry for the victim's family. He felt there was nothing he could have done to prevent the murder, because he did not know it was going to happen. He did not "agree with what we was doing that night" but never intended to harm anyone, and asked the victim's family for forgiveness. The defendant said that he pled guilty because he felt the murder was wrong, and that he deserved to go to prison but not to die. He decided not to testify pursuant to his plea agreement because upon being taken to Brushy Mountain after entering the pleas, he was placed in protective custody due to the possibility of retaliation from other inmates. Entering the pleas was like "signing a death warrant," and he decided he could not live with having to "watch [his] back all the time," worrying that he would be killed. He was aware that another inmate who had "told on some people" had been stabbed fifteen times in prison and killed. He and Anthony Jones had seen each other again while in transit, waiting to return to prison after court, and he informed Jones that he would not testify against him.

During cross-examination, the defendant admitted he was on probation at the time of the murder. On that night, the group discussed robbing a drug dealer. He did not report the murder to Officer Hankins when stopped because he was afraid. When later questioned, he initially lied and said he never got out of the car when Loveday was robbed and killed. He admitted that when he gave his statement to the police he had said that Anthony Rogers shot the victim three times, rather than two times, but did so out of fear. The defendant said that he was "drunk" on the night of the murder, but conceded that his blood-alcohol level was .042% at 3:00 a.m. when he arrived at the detoxification center. He recalled telling police during questioning that he had "blowed a .042 which is not even enough hardly to register." He lied to police when he said that he had not been using drugs and that he was forced to participate in the events that night by Anthony Jones and Ernest Rogers. He admitted to seeing Loveday at the pay phone and pointing him out to the others, knowing they were looking for someone else to rob. The defendant denied that Loveday was shot because he had no money and said there had been no plan to kill the next robbery victim after the Miller robbery.

Dr. Thomas Schacht testified for the defense as an expert witness in the field of clinical psychology. He had interviewed the defendant for one and a half days in August 1998 and testified as to the defendant's history. The defendant had had persistent ear infections which resulted in some hearing loss by age 5. He had no risk factors for early developmental problems, other than being born to a teenaged mother. However, he did have risk factors for mental and behavioral impairments. His mother had been diagnosed with bipolar disorder, both parents were substance abusers, and his paternal grandmother had some form of severe psychiatric illness. His natural father had a history of violence and multiple arrests. His parents divorced when he was an infant, and his mother admitted being an inconsistent and ineffective parent. He and his sister attended church regularly on their own, without either parent. The defendant was often left unsupervised by his mother and began criminal activities in exchange for being supplied with alcohol and drugs. He

reported acting as his stepfather's chauffeur at age 12, going with him to bars so that his stepfather could drink and the defendant could drive him home. The defendant's neighborhood was dangerous, and he reported being involved in many fights there as a result of being in a racial minority. In school, he earned "unsatisfactory" grades in conduct beginning in the second grade and continuing through the sixth grade. A psychological evaluation in 1989 indicated increasing learning and behavioral problems. His ability to think rationally was impaired. Evaluators reported a risk of brain damage caused by the defendant's "huffing" paint solvents between the ages of 13 and 14. Academic testing showed that the defendant had severe problems with verbal comprehension and math calculations, in which he ranked in the first and second percentile ranges. A second psychiatric consultation showed symptoms of severe emotional distress. The defendant had threatened suicide and had difficulty controlling his impulses. As of 1990, school officials did not feel that the defendant's problems were the result of attention deficit disorder or substance abuse. A later report by Mountain View Youth Developmental Center, however, noted that he had been a heavy marijuana user since age 12.

Based on his own evaluation, Dr. Schacht testified that the defendant suffered from a severe personality disorder with notable borderline and antisocial traits. Dr. Schacht noted that in these cases, individuals typically had "marked difficulties with impulsivity, behavior that is damaging to self and others, intense and unstable interpersonal relationships." The defendant was found to have an I.Q. of 78, well below average, and the neuropsychological assessment showed he had mild to moderate deficits in tasks requiring "executive abilities, the ability to plan, to present a response to a problem that is organized and reasoned." Dr. Schacht estimated that the defendant had an 82% chance of committing another violent felony within ten years if given the opportunity to reoffend. The defendant had admitted to being armed "about seventy-five percent of the time," if a weapon was available, to being in fights on a regular basis, and to committing "hundreds" of car thefts and many residential burglaries. However, the defendant knew right from wrong.

At the conclusion of the proof, the jury sentenced the defendant to death. His motion for new trial was denied on May 6, 1999, and counsel filed a timely appeal in his behalf.

**Petition for Writ of Error Coram Nobis**

On November 23, 1999, while his direct appeal was pending, the defendant filed a petition for writ of error coram nobis, asserting that he was entitled to a new sentencing hearing based on the initial suppression but subsequent discovery of "highly mitigating" evidence unknown to the defense prior to his guilty pleas or sentencing hearing. This evidence consisted of a single-page handwritten document, the author of which was unknown, apparently memorializing that a witness named Paul James Brogan had said that he had seen a knife in or on the victim's hand. The state of the record is such that it cannot be determined whether it is a "statement" or even exactly what Brogan may have said. The trial court denied the petition, following a hearing, and the defendant filed a notice of appeal, docketed under Case No. E2000-00957-CCA-R3-CO, on February 4, 2000. Pursuant to the supreme court's holding in State v. Mixon, 983 S.W.2d 661, 672-73 (Tenn. 1999), the appeal from the denial of the writ of error coram nobis was consolidated with the defendant's appeal as of

-24-

right, so that the issue raised in the coram nobis proceeding would be considered following the disposition of the issues raised in the defendant's appeal as of right. The issue of an alleged <u>Brady</u> violation, based upon the nonproduction of the Brogan "statement," was presented in the defendant's amended motion for new trial filed on May 5, 1999.

## Withdrawal of Counsel

Prior to the completion of briefing in this matter, the defendant and his attorneys, at his insistence, filed motions to withdraw from further representation of the defendant on appeal. This court denied the motions in March 2000. The defendant then filed a *pro se* application for extraordinary appeal pursuant to Tennessee Rule of Appellate Procedure 10 to the supreme court from the order denying his motion to withdraw counsel. The supreme court granted the application on July 10, 2000, and remanded the case to this court for the appointment of new counsel. Both of the defendant's former counsel of record, who also represented the defendant at trial, were relieved of further representation. In September 2000, this court appointed attorneys Gerald L. Gulley and Tim S. Moore to represent the defendant on appeal. They filed a statement adopting the appellate brief previously filed by former appellate counsel and later filed a supplemental brief of their own.

## <u>ANALYSIS</u>

We will now consider the issues presented on appeal by the defendant.

**I.    The evidence presented in its entirety and as contained in the record was insufficient as a matter of law to support a sentence of death.**

Although the defendant characterizes this issue as a challenge to the sufficiency of the evidence, the basis for his argument is that the death sentence in his case is disproportionate compared to the sentences received by defendants in similar cases. Accordingly, we will consider this claim when we make our proportionality review.

**II.    The jury failed to properly consider and weigh the mitigating evidence against the aggravating factor found.**

The State sought to establish two aggravating factors: that the defendant had previously been convicted of a felony involving violence to the person and that the murder was committed for the purpose of avoiding arrest or prosecution of the defendant or another. <u>See</u> Tenn. Code Ann. § 39-13-204(i)(2), (6). The prior felony conviction relied upon was that for the aggravated robbery of Matthew Miller, which occurred about one hour prior to the Loveday murder. The jury found that only the (i)(2) factor, of a previous violent felony conviction, was proven beyond a reasonable doubt.

As to mitigation, the jury was instructed to consider that the defendant was an accomplice whose participation in the murder was relatively minor, the youth of the defendant at the time of the offense, and that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct

to the law was substantially impaired by a mental disease or defect or by intoxication. See Tenn. Code Ann. § 39-13-204(j)(5), (7), (8).

Although conceding that the (i)(2) aggravating factor was proven, the defendant argues that the jury "should not have found" that this single factor outweighed beyond a reasonable doubt the many mitigating circumstances presented. He concludes that the jury's decision reflects its failure to give proper weight to these mitigating circumstances, many of which were "not of [his] making."

The State responds that the weight to be given to the mitigating and aggravating circumstances in the sentencing phase of a capital case is entirely within the discretion of the jury. State v. Pike, 978 S.W.2d 904, 918 (Tenn. 1998), cert. denied, 526 U.S. 1147, 119 S. Ct. 2025, 143 L. Ed. 2d 1036 (1999). The State asserts that, considering the entire record, there is sufficient evidence to support the jury's determination that the (i)(2) aggravating factor outweighed the mitigating circumstances beyond a reasonable doubt. As noted by the State, "[t]he weight given aggravating and mitigating circumstances is entirely within the province of the jury. The jury determines whether mitigation exists and whether the aggravating circumstances outweigh mitigation beyond a reasonable doubt." State v. Bland, 958 S.W.2d 651, 661 (Tenn. 1997) (citing State v. Barber, 753 S.W.2d 659, 669 (Tenn. 1988)). Further, referring to the (i)(2) factor in particular, our supreme court has stated that "[b]y their very nature, and under the proof in certain cases, . . . some aggravating circumstances may be more qualitatively persuasive and objectively reliable than others." State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993).

At the sentencing hearing, the defendant testified as to his life history. He came from a broken home, had little parental supervision, and grew up in a dangerous neighborhood. This background contributed to his long history of substance abuse, which began at age 9 with marijuana. By age 12, the defendant regularly used marijuana, cocaine, Valium, alcohol, and embalming fluid. Eventually his drug use escalated to include crack cocaine, LSD, crystal methamphetamine, and other substances. The defendant had a low I.Q. and learning and behavioral problems, and dropped out of high school in the ninth grade. He offered further proof to show that he was relatively young when the offense was committed, had no prior history of violent criminal activity, was impulsive and easily influenced, and suffered from a severe personality disorder.

On cross-examination, the State established through the defendant's witnesses that his mother was unable to control or discipline him and that his sister, who grew up in the same environment as the defendant, did not have a criminal history and had never killed anyone. On rebuttal, the State presented testimony that the defendant bragged to a friend that he, personally, had killed the victim and that he seemed excited about it. In addition, witnesses testified that the defendant was on probation at the time of the murder, that the defendant stated that the victim was killed because he had no money, and that the defendant had an extensive criminal record.

The record reflects that the jury was properly instructed on the applicable statutory aggravating and mitigating circumstances. The defendant does not contend that the trial court refused to instruct the jury on any other requested mitigating circumstances. "It is an elementary

principle of law that jurors are presumed to follow the instructions of the trial court." State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998) (citing State v. Cribbs, 967 S.W.2d 773, 784 (Tenn. 1998); State v. Laney, 654 S.W.2d 383, 389 (Tenn. 1983)). As the State observes, the jury rejected the State's attempt to establish the (i)(6) aggravator, that the murder was carried out to avoid arrest or prosecution. The fact of the defendant's prior violent felony conviction was clearly proven by evidence of the judgment convicting the defendant of the earlier Miller robbery. Against this factor, the jury weighed the statutory factors and other proof offered by the defendant in mitigation.

Following our review of the record on appeal and applicable authorities, we conclude that the evidence is sufficient to support the jury's finding that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt.

### III. The trial court erred in refusing to grant defendant's motion to strike from the State's notice of aggravating circumstances that the defendant had a previous felony conviction involving the use of violence to the person.

The application of the section 39-13-204(i)(2) factor required the jury to find beyond a reasonable doubt that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person."

At the conclusion of the sentencing hearing and in his motion for new trial, the defendant argued that the (i)(2) aggravator should be stricken, theorizing that the Miller robbery and the Loveday robbery/murder were part of a crime spree, and, as such, the Miller robbery conviction could not be separately considered as an aggravating circumstance in the crimes against Loveday which occurred only one hour later. On appeal, the defendant argues that the relevant inquiry turns on the meaning of the words "previously convicted" in section 39-13-204(i)(2). Although acknowledging case law pointing to a contrary result, he argues that the phrase should be construed consistent with the definition of "prior conviction" as set forth in Tennessee Code Annotated section 40-35-106(b), citing the holding of our supreme court in State v. Blouvett, 904 S.W.2d 111 (Tenn. 1995), in support. Section 40-35-106(b) contains part of the general sentencing provisions applicable to multiple offenders and provides as follows: "'Prior conviction' means a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced." Interpreting this language, the Blouvett court concluded that the phrase "'prior conviction' means a conviction that has been adjudicated prior to the commission of the more recent offense for which sentence is to be imposed." 904 S.W.2d at 113.

The defendant argues that because both the (i)(2) statutory aggravating circumstance in a capital case and the aggravating factor of a prior conviction in a noncapital case are used to enhance a defendant's possible penalty, the terms should be given similar meaning. Thus, by this argument, because the Miller robbery conviction was not adjudicated prior to the *commission* of the Loveday robbery/murder, the former conviction should not be considered as a previous conviction in

sentencing the defendant under section 39-13-204(i)(2). Without this sole aggravating circumstance, the defendant's death sentence could not stand.

The State responds that as long as the fact of a prior violent felony conviction has been *adjudicated* prior to the sentencing hearing in the capital case in which it is offered, such conviction may be used to establish the (i)(2) aggravator. In fact, our supreme court again recognized this principle in State v. Stout, 46 S.W.3d 689, 719 (Tenn. 2001) (appendix):

> Our Supreme Court has recently reiterated its oft-repeated holding that, "so long as a defendant is *convicted* of a violent felony *prior* to the sentencing hearing at which the previous conviction is introduced, this aggravating circumstance is applicable." State v. Hodges, 944 S.W.2d 346, 357 (Tenn. 1997) (emphasis in original). In State v. Nichols, 877 S.W.2d [722,] 736 [Tenn. 1994], the Court specifically rejected the defendant's contention of a due process violation, even where the prosecutor admitted that the defendant's multiple trials had been ordered in such a way as to create an additional aggravating circumstance. And in State v. Caldwell, 671 S.W.2d 459, 465 (Tenn. 1984), the Court specifically rejected the argument that a prior conviction based on a subsequent crime permitted an *ex post facto* law. This issue is therefore without merit.

Moreover, Blouvett, cited by the defendant in support of this argument, is distinguishable on several points. Most significantly, Blouvett was not a capital case. Because differing sentencing schemes have been set forth by the legislature for capital and noncapital cases, and there is no indication of a legislative intent to apply definitions found in one section of the code to provisions in another section of a different code volume, the holding in Blouvett does not support the defendant's argument in this regard.

Further, it appears that the defendant's suggested interpretation of a "previous conviction" under section 39-13-204(i)(2) would unduly restrict the stated language of that code section. As our supreme court recently reiterated in State v. Owens, certain considerations must be applied in statutory construction:

> In deriving legislative intent and purpose, we must not "unduly restrict [ ] or expand [ ] a statute's coverage beyond its intended scope." Rather, we are to ascertain a statute's purpose from the plain and ordinary meaning of its language "without forced or subtle construction that would limit or extend the meaning of the language." Moreover, the General Assembly has specifically directed that criminal statutes . . . be construed "according to the fair import of their terms, including reference to judicial decisions and common law

interpretations, to promote justice, and effect the objectives of the criminal code." Tenn. Code Ann. § 39-11-104 (1997).

20 S.W.3d 634, 640 (Tenn. 2000) (citations and footnote omitted).

A plain reading of section 39-13-204(i)(2) shows that the term "previously convicted" is unambiguous and therefore need not be read in *pari materia* with any other sentencing statute. As the supreme court stated in State v. Caldwell:

> The language in the statute, "previously convicted" clearly indicates that the date of the conviction, not of the commission of the crime, is the important factor. The order in which the crimes were actually committed is irrelevant, as long as the convictions have been entered before the sentencing hearing at which they are introduced into evidence.

671 S.W.2d 459, 465 (Tenn. 1984); see also State v. Nichols, 877 S.W.2d 722, 736 (Tenn. 1994).

Thus, we conclude that the defendant's argument in this regard is without merit.

### IV. The trial court erred in refusing to allow the defendant to withdraw his guilty pleas.

### A. The trial court did not allow the defendant to withdraw his guilty pleas, although they were, in effect, uncounseled pleas and there were fair and just reasons why the pleas should have been withdrawn.

The gravamen of this claim is that his pleas of guilty were, in essence, "uncounseled" and, therefore, involuntary, and, further, that he presented "fair and just" reasons for withdrawing them. We will examine these contentions.

On January 19, 1999, prior to sentencing, the defendant moved to withdraw his guilty pleas in the Loveday robbery/murder. Later that same day, a hearing was held, and the motion was denied. On appeal, the defendant argues that the trial court should have permitted the withdrawal of his pleas on the following grounds: (1) he was pressured into taking the plea agreement; (2) he did not understand that the agreement required him to testify against all of his codefendants; (3) he did not have an opportunity to discuss the plea agreement with his mother before accepting it; (4) he was denied the right to counsel at the time the pleas were entered; and (4) he felt his life would be at risk in prison if he testified against his codefendants. Although the defendant's brief focuses on the standard for withdrawal of a guilty plea pursuant to Tennessee Rule of Criminal Procedure 32(f), implicit in his argument is the claim that his guilty pleas were not voluntary, understanding, and knowing. We now will consider these claims.

**Voluntariness of Pleas**

In <u>Boykin v. Alabama</u>, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), the United States Supreme Court held that the record must show that a guilty plea was made voluntarily, understandingly, and knowingly. <u>Id.</u>, 395 U.S. at 242, 89 S. Ct. at 1711. As our supreme court stated in <u>State ex rel. Barnes v. Henderson</u>, "[i]t is recognized in this State, as in all jurisdictions, that a plea of guilty must be made voluntarily and with full understanding of its consequences." 220 Tenn. 719, 727, 423 S.W.2d 497, 501 (1968). The record must establish that the defendant was aware of and waived his Fifth Amendment privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers.

In Tennessee, the acceptance of a guilty plea is further governed by Rule 11 of the Tennessee Rules of Criminal Procedure and our supreme court's decisions in <u>State v. Mackey</u>, 553 S.W.2d 337 (Tenn. 1977), and <u>State v. McClintock</u>, 732 S.W.2d 268 (Tenn. 1987). Rule 11 and <u>Mackey</u> require the trial judge to address the defendant personally in open court and explain the following information and rights:

> a.) the nature of the offense to which the plea is offered;
>
> b.) the mandatory minimum penalty and the maximum penalty prescribed by law;
>
> c.) when the defendant appears without counsel, the right to be represented by an attorney, and, if indigent, counsel will be appointed to represent him;
>
> d.) the right to plead not guilty or persist in that plea if such a plea has been previously entered;
>
> e.) the right to trial by jury;
>
> f.) the right to the assistance of counsel if the defendant elected to go to trial;
>
> g.) the right to confront and cross-examine the state's witnesses if he elected to go to trial;
>
> h.) the privilege against compulsory self-incrimination, which could be invoked if he went to trial;
>
> i.) a plea of guilty waives the right to a trial, and only a sentencing hearing will be conducted;

> j.) the trial judge may ask him questions about the offenses to which he is pleading guilty, he must answer the questions under oath, and his answers may later be used against him in a prosecution for perjury or false statement if he doesn't answer the questions truthfully;
>
> k.) a different or additional punishment may result by reason of his prior convictions or other factors which may be established after the entry of his plea; and
>
> l.) evidence of any prior convictions may be presented for consideration in determining the appropriate punishment.
>
> In addition, the trial judge must ascertain whether there is a factual basis for the plea, the plea is being voluntarily entered, the defendant's understanding of his entry of the plea, and whether the defendant's willingness to plead guilty is a result of discussions between the district attorney general and the defendant or his attorney before accepting the defendant's plea.

Chamberlain v. State, 815 S.W.2d 534, 538-39 (Tenn. Crim. App. 1990) (footnotes omitted).

The additional advice requirement was explained in McClintock, 732 S.W.2d at 273, that it must be made clear to the defendant pleading guilty that the resulting judgment of conviction may be used to enhance the punishment for any subsequent offenses in a later proceeding. In order to ensure that the plea is entered "intelligently" and "knowingly," "Boykin requires that the trial court 'canvass[ ] the matter with the accused to make sure he has a full understanding of *what the plea connotes and of its consequences*.'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 244, 89 S. Ct. at 1712).

An accused is not entitled to withdraw a plea of guilty as a matter of right. State v. Turner, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). The question of whether he should be permitted to do so is addressed to the sound discretion of the trial court regardless of when the motion is filed. Id. An appellate court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record, meaning that there is no substantial evidence to support the conclusion of the trial court.

The defendant does not complain that he was not aware of his federal constitutional "Boykin rights," and the submission hearing transcript reflects a valid waiver of these rights. Rather, in seeking the withdrawal of his pleas in the trial court, the defendant first argued that he did not understand that the recommended sentence of life with the possibility of parole was conditioned upon his testifying against all of his codefendants.

The plea agreement form executed by the defendant expressly provides that the:

> Defendant agrees that he will, if called upon, testify truthfully in any other proceeding in connection with this incident. Said testimony will be consistent with the statements defendant made to Knox County Sheriff's Department officers.
>
> Sentencing in this case is reserved.

The transcript of the submission hearing reflects that the trial court questioned the defendant as to this provision of the agreement:

> THE COURT: And do you understand, sir, that until . . . we've got to the point of testimony, or conclusion of the cases of the co-defendants sentencing will be reserved, and you will wait for sentence, and it is agreed further that you will testify truthfully and consistently with the statements that you previously made?
>
> Do you understand all that, sir?
>
> MR. MELLON: Yes, Your Honor.

We note that the defendant's statements are that at the time of the two incidents, his companions were David Jones, Anthony Jones, and Ernest Rogers. At the hearing, after the defendant had testified as to his understanding of the plea agreement, he was then asked about his intentions as to testifying in the trials of his codefendants:

> MR. MELLON: I would like to say something.
>
> I under, I did not understand that I was to testify against all co-defendants.
>
> I thought it would be Anthony, Anthony Jones, only.
>
> So, I did not, I misunderstood the agreement at that point.
>
> THE COURT: Assuming that it is as to each co-defendant, do you still understand that, do you still state that you would testify or not testify?
>
> MR. MELLON: Yes, ma'am.

Later, in the hearing, the defendant agreed, during cross-examination, he had understood that his guilty plea agreement required his testimony at subsequent trials:

Q   Mr. Mellon, you understood that you were pleading guilty to the offense, and that the only thing that was being reserved was the right of sentence? Whether you would be sentenced to life with parole, life without parole, or death?

And on the especially aggravated robbery that you would be sentenced to fifteen to twenty-five years?

You understood that those two things were specifically reserved, didn't you?

A   No, I understood that the plea agreement was life with parole which was fifty-one years, with the especially aggravated robbery ran concurrent and twelve years run consecutive.

Q   And that that sentence recommendation was conditioned upon your testifying?

A   Correct.

Q   That the sentencing recommendation had nothing to do with your entering the plea of guilty?

A   I don't understand that.  Could you clarify it?

Q   That your sentencing recommendation had nothing to do with your entering the plea of guilty to first degree murder or to especially aggravated robbery.  It was strictly based on whether or not you would testify?

A   Yes.

The trial court concluded that the defendant's pleas of guilty were voluntary and he had understood that the agreement required his subsequent testimony:

Mr. Mellon gave a free, voluntary, and knowing plea agreement, knowing that he would testify against at least Mr. Jones who now he is fearful of, and that he took this plea under the stress of things.  That he understood what the agreement was.

He has told us today that he clearly understood the agreement, and that it was conditioned upon his testifying.

. . . .

Based upon the letter that Mr. Mellon has sent, based upon what
he said here today, at the time of the plea agreement Mr. Mellon made
a free, voluntary, and knowing plea, knowing the contingencies and
knowing that he had to testify against at least one of the co-
defendants, if not all of them.

I think he knew he had to testify against all of them. But the one
that's a big concern here was Anthony Jones.

He knew that then.

The record supports the trial court's finding that the defendant understood the plea agreement
and his obligation was to testify against all of his codefendants in exchange for the State's sentencing
recommendation.

The defendant also asserts that he was pressured or coerced into pleading guilty. At the
hearing on the motion, the defendant informed the trial court of his reasons for wanting to withdraw
the pleas. He testified that from the beginning of the proceedings, he informed his attorneys that he
did not want to accept a plea agreement but wanted to go to trial. He continued to decline the offered
plea agreement until October 9, 1998, three days prior to when the trial was to begin. On that
morning, the defendant's counsel came to court prepared to argue for a continuance of the trial.
They first met with the defendant, informing him that the prosecutor would withdraw the plea offer
if it was not accepted that day. He again informed his attorneys that he would not plead guilty. After
the attorneys left, Mike Cohan, an investigator employed by defense counsel, visited the defendant.
The defendant later testified that Cohan continued to pressure him, telling him he would receive the
death penalty if he went to trial, and that he became aggravated and finally said "yes" to the plea
agreement. Defense counsel Jeffress stated he was "astounded" and "amazed" when Cohan came
from the jail and informed counsel that the defendant had decided to plead. Cohan did not testify
at the hearing.

Defense counsel stated that, after hearing from Cohan that the defendant had decided to plead
guilty, they returned to the jail to confirm the defendant's intention and explain the plea process to
him. Although the record does not reflect when the plea proposal was first offered to the defendant,
it is apparent from the defendant's testimony that he discussed the matter with counsel on several
occasions.

Prior to addressing the defendant's motion to withdraw his guilty pleas, the court heard his
*pro se* motion for withdrawal of his counsel, and the following exchange took place:

THE COURT: Can you give me an example of a way in which they
have not [zealously represented you] at this point?

MR. MELLON: I feel like that, I feel like I should have had more time, or more access to the lawyers considering my case, as severe as it is, and also, that, I never, I, I wanted to go to trial from the very beginning. So, I feel like that, well, this is it. I feel like I needed to go to trial, and I feel like I was coerced into taking a plea agreement.

THE COURT: In what way?

MR. MELLON: Not, I won't say by the lawyers. But I feel like, you know, they knew I didn't want to take the plea agreement from the very beginning.

And then I feel like, I feel like the question should have died right then, and let me proceed on going to trial.

Instead, the question kept coming up, to take the plea or not.

The defendant's claim that he was pressured into pleading guilty is contradicted by his testimony at the submission hearing. At that hearing, he testified that he had gone over the entire request for waiver of jury trial and acceptance of guilty plea form, paragraph by paragraph, with his counsel. Asked whether he was entering into the agreement "freely, voluntarily, and knowingly, that is, knowing what you are doing of your own free will, and without pressure from anyone," the defendant answered, "Yes, Your Honor." The defendant further testified under oath at the submission hearing that he had thoroughly discussed the matter with both of his attorneys and that he was satisfied with their efforts and services on his behalf. Although the defendant implies that he was pressured into pleading guilty by repeated discussion of the issue by counsel and then by the defense team investigator, the investigator, as we have stated, did not testify during the hearing on the motion to withdraw the guilty pleas. Counsel conceded to the court that he was aware that the investigator met with the defendant but did not know that co-counsel was not present. The record reflects that the defendant had entered guilty pleas on three other occasions, including the Miller robbery, was familiar with the plea agreement process, and was aware that one of his options was to go to trial. "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31, 91 S. Ct. 160, 164, 27 L. Ed. 2d 162, 168 (1970). In addition, by his own testimony, the defendant did not claim that the attorneys coerced him into ultimately pleading guilty, only that they and their investigator repeatedly advised him to accept the plea agreement. "Counsel may use reasonable persuasion when making the recommendation." Parham v. State, 885 S.W.2d 375, 384 (Tenn. Crim. App. 1994) (footnote omitted). The defendant has presented no other evidence to support this claim, and we conclude that the record supports the trial court's determination that the defendant's pleas of guilty were free and voluntary.

The defendant next argues that he should be permitted to withdraw his guilty pleas because of his fear that he would be killed or harmed by other inmates if he carried out his agreement to testify against his codefendants.

After accepting the plea agreement on October 9, 1998, and returning to prison on October 14, the defendant stated he was immediately placed in an "administrative lock down" because rumors had circulated that he would be killed. He remained in lockdown for thirty-three days and was then transferred to Northeast Correctional Complex. The defendant stated he then decided not to testify because in prison, he would be labeled a "snitch" and "in prison people like that get killed." He recalled that in December 1997, after their arrest, he and codefendant Anthony Jones were once placed in a holding cell together. Jones hit him for no apparent reason, and the two fought. The defendant testified that he was also aware that Anthony Jones had had a fight with another codefendant, David Jones, in which David Jones was nearly killed. Almost a year after their first encounter, following his pleas of guilty, the defendant again encountered Anthony Jones in a jail cell. The defendant informed Anthony Jones that he would not be testifying against him, to which Jones responded, "That's cool." The defendant explained why he had not wanted to plead guilty but admitted that he had not been physically harmed or threatened by anyone in prison since entering the guilty pleas.

The trial court found that the defendant's fears could not have affected the voluntariness of his pleas because they did not arise until after he pled guilty and returned to the prison. The court observed that the "duress that Mr. Mellon is feeling now is duress that occurred after this plea agreement." The record supports the court's finding. The defendant testified at the submission hearing that he understood that the State's sentencing recommendation was based on his truthful testimony in any other proceedings involving the Loveday robbery and murder. Moreover, the defendant conceded at the hearing on the motion to withdraw the pleas that he understood that the sentencing recommendation was based only on his truthful testimony and that he knew when he entered the pleas that he would be required to testify against Anthony Jones in particular. At the time he entered his pleas, the defendant expressed no concern for his safety, despite an earlier altercation with Jones, and, in fact, waited until several months later to request that his pleas be withdrawn. Thus, we conclude, as did the trial court, that the defendant's claims of fear for his safety do not provide a basis for withdrawal of his pleas of guilty.

On appeal, the defendant also argues that he was denied the right to counsel in entering his pleas. He says that because his decision to plead came after he was visited by an investigator, and he had persistently declined the same advice from his attorneys, he was essentially "uncounseled" in entering the pleas. As further evidence of this claim, he argues that because he had filed *pro se* motions to withdraw counsel, the trial court was aware that he had a problematic relationship with his attorneys. However, the record does not support the defendant's claim that his decision to enter a plea was without the advice of counsel on either of these grounds. This argument ignores trial counsel's testimony that after the defendant had spoken with the investigator and decided to plead guilty, both his attorneys met with him to confirm his decision, and, apparently satisfied, then informed the prosecution of his decision and proceeded to the submission hearing. Further, at that

hearing, the defendant testified that he had gone over each paragraph of the agreement with his attorneys and understood its provisions. Although he filed several *pro se* motions to "withdraw" counsel after entering his pleas, he told the court at the submission hearing that he was satisfied with their efforts on his behalf and that he had discussed the agreement with them.

Finally, the defendant argues that he did not have the chance to discuss the plea agreement with his mother before accepting it, and he felt that his decision was "just a rushed thing." Again, the record does not support that he had any reservations about entering into the plea agreement or was "rushed" into doing so. He does not reveal how further discussions with his family or additional time would have altered his decision.

In this matter, the record belies the defendant's contention that he did not understand that sentencing pursuant to his plea agreement meant that he would testify against his codefendants. Nor is there evidence to show that the defendant was coerced by his counsel or the investigator to plead guilty. While he may later have decided he would not carry out the agreement to testify based on perceived danger or threats from other inmates, the record supports the trial court's finding that the defendant voluntarily, knowingly, and understandingly entered guilty pleas in this case.

### Fair and Just Reason

The defendant further argues that even if his pleas were not constitutionally invalid, there are "fair and just" reasons which satisfy the standard for withdrawing a plea under Rule 32(f) of the Tennessee Rules of Criminal Procedure. In brief, these reasons consist of the defendant's unwillingness for the months prior to his pleas of guilty to enter such pleas, of the alleged pressure upon him to do so, and of his fear as to what might happen to him if he testified subsequently as a State's witness.

Rule 32(f) governs the situations in which a guilty plea may be withdrawn prior to a final judgment:

> Withdrawal of Plea of Guilty. A motion to withdraw a plea of guilty may be made upon a showing by the defendant of any fair and just reason only before sentence is imposed; but to correct manifest injustice, the court after sentence, but before the judgment becomes final, may set aside the judgment of conviction and permit the defendant to withdraw the plea.

Tenn. R. Crim. P. 32(f).

In this matter, since the defendant moved the court to withdraw his pleas prior to sentencing, the more lenient "fair and just reason" standard applies. However, the burden of establishing that the plea should be withdrawn is on the defendant. State v. Turner, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995).

In determining what constitutes a "fair and just reason," this court has looked to the factors relied upon by the Court of Appeals for the Sixth Circuit. See State v. Patrick Maxwell, No. E1999-00124-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 848, at **25-26 (Tenn. Crim. App. Oct. 27, 2000); State v. Antonio Demonte Lyons, No. 01C01-9508-CR-00263, 1997 Tenn. Crim. App. LEXIS 773, at *38 (Tenn. Crim. App. Aug. 15, 1997) (citing United States v. Alexander, 948 F.2d 1002, 1003 (6th Cir. 1991)). As discussed in United States v. Spencer, 836 F.2d 236, 239-40 (6th Cir. 1987), cert. denied, 486 U.S. 1009, 108 S. Ct. 1736, 100 L. Ed. 2d 200 (1988), those factors are:

> 1. The length of time between the entry of the guilty plea and the filing of the motion to withdraw it;
>
> 2. Why the grounds for withdrawal were not presented to the court at an earlier point in the proceedings;
>
> 3. Whether the defendant has asserted and maintained his innocence;
>
> 4. The circumstances underlying the entry of the plea of guilty, the nature and background of the defendant, and whether the defendant has admitted guilt; and
>
> 5. Once the defendant has established a fair and just reason, whether the prosecution will be prejudiced should the plea be withdrawn.

We now will apply these considerations to this matter. Because of the relationship between the first two considerations, we will review them together.

In counsel's affidavit, which was attached to the motion to allow the defendant to withdraw his guilty pleas, the defendant's concerns were traced as to possible retaliation by codefendants if he testified at their trials. According to the affidavit, he had been concerned, prior to the entry of his pleas, "of what might happen to him in prison if he were labeled a 'snitch' as the result of such testimony." The defendant advised counsel on October 23, 1998, that he had been placed into protective custody because of the knowledge of other inmates as to his agreement to testify against his codefendants. He told counsel on that date "that he was seriously considering not to testify against anyone as he had agreed to do in his plea agreement." His decision as to this matter became final, and the State was so advised, the day that the defendant was to testify against his codefendant, Ernest "E" Rogers. The motion, supplemented by counsel's affidavit, to withdraw the guilty pleas was filed on January 19, 1999.

Our review of the first two considerations, the length of time between the guilty pleas and the motion for their withdrawal, as well as why the grounds for withdrawal were not earlier presented to the court, does not benefit the defendant. At the time of his pleas of guilty, he was aware of possible reprisals as a result of his testifying against his codefendants. Yet, he waited approximately two and one-half months to seek to withdraw his pleas, not doing so until he was to testify against

a codefendant. Thus, the defendant reweighed his options, using essentially the same information he had at the time of his pleas but, this time, reached a different conclusion. Accordingly, we conclude that his motion was not timely and was based solely upon a change of mind.

Both at the submission hearing and the sentencing hearing, the defendant admitted his role in the robbery and murder. At sentencing, he testified he knew what he had done was wrong but felt he did not deserve the death sentence for his participation. Only in arguing to withdraw his pleas did the defendant assert that he was not guilty of these offenses. Thus, our consideration of this "important factor" favors the State. See Spencer, 836 F.2d at 239.

At the submission hearing, the defendant testified that he was 22 years old, that he completed the eighth grade in school, that he could "read and write without any trouble," and that he was guilty as charged. Although given the opportunity, the defendant asked no questions evincing a misunderstanding of or seeking clarification as to the guilty plea process or agreement. The defendant had previous felony convictions for theft and fraudulent use of a credit card and misdemeanor convictions for reckless driving, driving with a revoked license, evading arrest, reckless endangerment, shoplifting, and vandalism, as well as for theft, trespass, and possession of a weapon on school property, these latter charges incurred from the same incident. Further, he had juvenile convictions for auto theft and larceny. Thus, the defendant had previous experience with the criminal justice system.

As the trial court correctly recited, the standard for withdrawing a guilty plea, under Tennessee Rule of Criminal Procedure 32(f), requires that the defendant show a "fair and just" reason in support. Considering each of the defendant's proffered reasons for withdrawal of the pleas, the trial court concluded, "I don't think he's given me a fair and just reason to withdraw his plea, and I am going to require his plea to stand . . . ."

On appeal, the defendant presents three reasons why he was pressured into his pleas of guilty, making them involuntary: "fear of the possible consequences of testifying against co-defendants"; pressure because of "the State's and the trial court's insistence that he decide immediately whether he would try the case or plead"; and not having the "benefit of family input to his decision." Thus, according to the defendant, he has presented a "fair and just" reason why he should be permitted to withdraw his pleas of guilty. We respectfully disagree that any of these constitute a "fair and just" reason for withdrawing his pleas of guilty.

The record shows that the defendant was fully advised of his rights, which he waived, before entering knowing and voluntary pleas of guilty. He showed no hesitation or lack of understanding by his responses during the submission hearing. The benefit to the defendant of the pleas was evident, for, by doing so, he would avoid the risk of being sentenced to death, and the sentences imposed would be served concurrently. The possible risk of testifying against his codefendants should have been just as apparent to the defendant prior to the pleas as it was afterwards. A final observation from Spencer is relevant to our determination that the defendant did not provide a basis for withdrawing his pleas of guilty:

"A swift change of heart is itself strong indication that the plea was entered in haste and confusion . . . . By contrast, if the defendant has long delayed his withdrawal motion, and has had the full benefit of competent counsel at all times, the reasons given to support withdrawal must have considerably more force."

836 F.2d at 238 (quoting United States v. Barker, 514 F.2d 208, 222 (D.C. Cir. 1975)).

We cannot conclude that the trial court abused its discretion in determining that the defendant had failed to present a "fair and just" reason for withdrawal of the pleas.

Additionally, the defendant argues that his statements to law enforcement officers were "so contradictory that [his] affirmance of them would be largely useless at trial, especially in light of the testimony of Edward Allen Beeler." However, the agreement, which was that the defendant would testify in accord with these statements, did not include a provision that he could decline to do so if the statements were, themselves, contradictory or duplicative of the testimony of Beeler. Just as the State could not repudiate this agreement if it concluded that the defendant's testimony was duplicative of other proof and, thus, unneeded, neither could the defendant.

Thus, the record fully supports the trial court's conclusion that the defendant did not establish a "fair and just" reason for withdrawal of his pleas of guilty. Accordingly, we conclude that this assignment is without merit.

> **B. The trial court erred when it did not allow the defendant to withdraw his guilty pleas and proceed to trial, on the basis of the State's failure to disclose Brady material.**

The defendant argues that he should have been permitted to withdraw his pleas based on an alleged Brady v. Maryland[4] violation, explaining "[w]hen the State has offered discovery to a defendant that is directly opposed to the later discovered evidence, there is a greater call for a trial on the merits." As discussed in Issue V, below, because it does not appear that the defendant has established a Brady violation, this issue is without merit.

---

[4]373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

## V.  The State failed to make full disclosure pretrial of exculpatory evidence.

This issue was precipitated by a handwritten document, the origin of which is not clear from the record, bearing the name Paul James Brogan, 11016 Hoghlan Drive, 671-3842, and what apparently is his statement:

> Pulled up across street saw boy on ground called police seen him trying to breeth [sic].  Nife [sic] was in [or "on"] hand & robbers on the ground next to him[.]  Did not touch anything bot [sic] phone.[5]

In his brief, the defendant represents this statement as being that Brogan "had seen an open pocketknife in the hand of the deceased."  However, the written statement does not say whether the knife was open or closed.  Whether the writing says that the knife was "in" or "on" the victim's hand cannot be determined, by our view, for that word can be read as either.  Thus, although this claim is premised upon the victim's having an open knife in his hand, the statement recites only that he had a knife, not specifying whether it was open or closed, on or in his hand.[6]

At the hearing on the motion for new trial, defense counsel asked that the hearing be continued, advising the trial court that "sometime ago . . . within the last two weeks" defense counsel for Anthony Jones had been provided with the document bearing the name of Paul Brogan.  Counsel said they were provided with a copy of the statement, as well, but had not yet interviewed Mr. Brogan.  They knew Mr. Brogan was "in town," but the telephone number and address given for him were "evidently not current." Counsel argued that, had they known before the trial, an open or closed knife was in the victim's hand, that "would have had a lot of bearing on how we approached the mitigation phase[]."  Additionally, the information, according to the defendant's argument, "might have affected [his] decision to plead guilty" and, at the sentencing hearing, "could have affected the jury's regard for [the defendant] and [caused them to decide] that he need not suffer the death penalty."

In assessing the value of this statement, we first note other evidence in the record as to a knife at the crime scene.  Two photographs, in the record on appeal, of the Loveday crime scene show a folding knife, with the blade closed, on the ground by the driver's side door.  In his August 25, 1997, statement, Anthony "T-Bone" Jones spoke of the victim's having "either a gun or a knife, I don't

---

[5]We have attempted to reproduce this statement as handwritten but because of spelling errors, lack of punctuation, and the fact that certain letters have been marked over, are not certain that we have reproduced the statement as intended by its author, whoever that may have been.

[6]The basis for the defendant's claim that the knife was open may have come from a conversation between defense counsel and the prosecutor.  In his motion to continue the hearing on the motion for new trial, the statement is made that, according to the State, one of Brogan's statements was that "Mr. Loveday was lying on the ground outside his car with an *open* knife in his hand and that the witness gave the knife to law enforcement when they arrived." (Emphasis in original).  However, the "statement" of Brogan, which is the basis for the continuance request, does not specify whether the knife was open or closed.

know what it was. It was just something gleaming[.]" Jones told officers that "before I kn[e]w it, I seen a gleam and I was like[] damn, this fool about to kill me over something, . . . and before I knew it, I done grabbed the gun and shot him." Jones' statement of August 26, 1997, also told of the "gleam":

> "E". "E" had a gun to the back of dude head. I was going to take my
> pistol away from him. I seen some thing gleaming in his right hand,
> I was like, and before I looked at [the defendant], I looked at the dude
> again, it seemed like somethin' was just sittin' there just gleaming,
> seemed like it was silver or somethin', a knife or gun or something,
> so I just reacted.

Counsel for the defendant had filed an extensive motion for exculpatory evidence, including witness statements. The fact that the "statement" of Paul James Brogan was not produced to the defense, pursuant to this discovery request, is the basis for this claim. The defense did, however, have earlier notice that a "Paul James Brogan" was a witness in the matter. The indictment charging the defendant with the first degree murder and especially aggravated robbery of Robert Scott Loveday was returned by the Knox County Grand Jury on October 1, 1997, and listed as witnesses ten officers of the Knox County Sheriff's Department. However, on June 4, 1998, an order was entered naming six additional witnesses, four of whom were not identified as government employees, one of these being Paul James Brogan. The certificate of service with this order certifies that copies were sent by United States Mail to counsel for the defendant.

At the hearing on the motion for new trial, the prosecutor advised the trial court that on April 14, 1999, while preparing for the trial of Anthony Jones, he had interviewed Paul James Brogan for the first time and was told, regarding the statement and its contents:

> He told me at that time that he did not have a clear recollection of
> what had happened.

> That he had a knife in his hand, he thought. That he had made a
> statement, he thought, to the sheriff's department, and told me at that
> time he wasn't sure whether the knife was open or closed.

> That if it was open that he closed – but whatever was said in his
> statement was what happened.

The prosecutor argued that the statement was contrary to the defendant's statement that he had not seen the victim with a knife, that the statement was not exculpatory, and that defense counsel earlier had been provided with a copy of Anthony Jones' statement that he had seen a "gleam of something" in the victim's hand.

-42-

Subsequently, the trial court denied the request of defense counsel for a continuance of the hearing on the motion for new trial, noting that defense counsel had been advised of the existence of Paul James Brogan when he was added to the list of witnesses on June 4, 1998.

In Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215, 218 (1963), the United States Supreme Court held that the prosecution has a duty to furnish to the defendant exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. The Court held that "suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. The duty to disclose extends to all information favorable to the accused whether the evidence is admissible or inadmissible, State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993), and to information "which might be useful to the defense[.]" Branch v. State, 469 S.W.2d 533, 536 (Tenn. Crim. App. 1969). However, the State's duty to turn over evidence under Brady does not extend to information that the defense either already possesses or is able to obtain or to information not in the possession or control of the prosecution. Wooden v. State, 898 S.W.2d 752, 755 (Tenn. Crim. App. 1994) (citing Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). Further, Brady does not require the State to investigate on behalf of the defendant. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984).

In order to establish a due process violation under Brady, a defendant must show the following:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995) (citations omitted).

We now will apply these considerations to this matter.

By filing his motion for exculpatory statements, the defendant requested that he receive information such as the "statement" of Paul James Brogan. Thus, this material was sought by the defense. However, the remainder of our review is less helpful for the defense. Although the State did not produce the "statement" itself, the defendant was informed months before the trial setting that Brogan was a witness. Additionally, photographs, timely produced to the defendant, of the Loveday crime scene showed a knife with the blade closed by the driver's side door of the victim's

car. Thus, while the statement was not provided to the defendant, he was advised of the information it contained, as well as the identity of its apparent author. Finally, evidence that the victim may have had a knife in his hand was presented to the jury through the tape-recorded statement of Anthony Jones. Thus, although the "statement" itself may have been suppressed, the fact that a knife was at the scene was not.

Although the defendant argues that Brogan's statement was significant because it indicates that the victim had an open knife in his hand, the statement itself makes no reference to the knife being open or closed, and there is no evidence in the record of the knife being open. However, the defendant argues that eyewitness information that the victim had a knife, whether open or closed, was favorable exculpatory evidence which would have provided the jury with a "reason why the killing took place." In so arguing, the defendant attempts to reduce his culpability for the murder by showing that the actions of Anthony Jones, for which the defendant is held criminally responsible, were never intended by Jones or the defendant.

Although conceding that the evidence of a knife in the victim's hand would not have provided a self-defense theory to the offense of felony murder, the defendant argues that this may have been relevant to the jury as a factor militating against a sentence of death. Indeed, Brogan's statement would have supported that of codefendant Anthony Jones that he shot Loveday because he saw a knife in Loveday's hand and not, as the State argued, because Loveday had no money or to eliminate him as a witness to the robbery. In the context of a capital sentencing hearing, where the rules of evidence are relaxed and any evidence in mitigation is permitted, the defendant contends that Brogan's statement was a "powerful mitigating factor which might have tipped the scales in favor of life" for the defendant. On the other hand, on the basis of the evidence presented, the jury could have concluded that the defendant himself killed Loveday were it not for the fact that the State stipulated otherwise at the submission hearing. Thus, we conclude that the benefit to the defendant had this statement been timely produced would have been minimal at best.

With respect to the fourth prerequisite, our supreme court has adopted the standard of materiality announced in Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490, 505 (1995): there is constitutional error if there is a "reasonable probability that, had the evidence been disclosed to the [defendant earlier], the result of the proceeding would have been different.'" Edgin, 902 S.W.2d at 391. The Edgin court further stated:

> [The] "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

-44-

Id. at 390 (quoting Kyles, 514 U.S. at 434, 115 S. Ct. at 1566, 131 L. Ed. 2d at 506 (additional citation omitted)). In other words, in order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435, 115 S. Ct. at 1566, 131 L. Ed. 2d at 506.

In this matter, the State sought the death penalty based on two aggravating circumstances. The jury rejected the State's attempt to establish that the victim was killed in an effort to avoid arrest or prosecution of the defendant or the other participants to the crime and relied only upon the defendant's previous conviction for a violent felony in sentencing him to death. In reaching this decision, the jury had heard Anthony Jones' statement that he shot Loveday after seeing something, possibly a knife, gleaming in Loveday's hand. In addition, the defendant testified that he did not have time to react before Jones took his gun and shot the victim and that he could not have prevented the murder because he did not know it was going to happen. All of this testimony, as well as crime scene photographs showing a knife near the victim's car, tended to support the defendant's efforts to establish that neither the shooter, Anthony Jones, nor anyone else in the group, including the defendant, intended to harm anyone. Rather, the victim was shot as the result of a robbery gone awry when Jones reacted to something in the victim's hand. The jury's verdict, however, in which it did not find that the victim was killed as an effort to avoid leaving a witness to the crime, apparently took the defense's evidence into consideration. We cannot conclude that there is a reasonable probability that the sentence would have been different if additional evidence that the victim had a pocketknife in his hand had been presented. In fact, because of the crime scene photographs, the jury had evidence as to a knife near the victim before it and determined that the death sentence was supported only by the fact of the defendant's prior violent felony conviction. As previously noted, this aggravating circumstance may be more persuasive and reliable than others. State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993).

Thus, we conclude that the defendant has failed to establish that the requested information was suppressed or that it was material to his case. No due process right to a fair trial was violated.

**VI.     The trial court erred in denying the defendant's motion to continue the sentencing hearing in order that defendant's expert could evaluate medical test data not made available until the first day of the hearing.**

On the morning of the first day of the sentencing hearing, the defense received the results of medical tests administered to the defendant. The trial court denied the defense request for a continuance of one or two days in order to allow Dr. Schacht to review the data; and, the defendant asserts he was handicapped in effectively presenting Dr. Schacht's expert testimony.

The State responds that this assignment is without merit because both the results of the proceeding would not have been different if the continuance had been granted and the defendant had an opportunity to provide the test data to Dr. Schacht before he testified but failed to do so.

We note first that it is in the sound discretion of the trial court to decide whether to grant a continuance, and the trial court's decision will not be disturbed absent a clear showing of abuse of discretion. State v. Hurley, 876 S.W.2d 57, 65 (Tenn. 1993); State v. Gregory, 946 S.W.2d 829, 831 (Tenn. Crim. App. 1997). This court has further elaborated:

> [The trial court's] exercise of that discretion will not be disturbed absent a clear showing of prejudice to the defendant. The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done. A reversal will be ordered only if the reviewing court is convinced that the complaining party did not have a fair trial *and* a different result would or might reasonably have been reached had there been a different disposition of the motion.

State v. Goodman, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing Baxter v. State, 503 S.W.2d 226, 228 (Tenn. Crim. App. 1973)).

The record reflects that Dr. Schacht testified extensively based on his personal observations of the defendant, information and reports he was provided by others, and testing administered to the defendant in preparation for the sentencing hearing. His testimony as to certain neurological tests, upon which the defendant bases his claim that a continuance should have been granted, was as follows:

> Q   What were the results of those tests?
>
> A   [T]he results as far as I understand them were normal.
>
> Q   What tests were given?
>
> A   I have not seen the report. There were neuroimaging studies. I think there was an MRI. I have not seen the written reports so I can't go beyond that.
>
>     I think we've been given a verbal report.

Although the defendant argues that his examination of Dr. Schacht was "handicapped," the record does not establish that the result of the proceeding would have been different or that the defendant would have benefitted had Dr. Schacht had been permitted more time to review the medical data. The transcript of the hearing on the motion reflects that the stated reason for requesting the continuance was that Dr. Schacht was testifying in another trial at the beginning of the week of the defendant's trial as to punishment. As it happened, Dr. Schacht testified at the defendant's trial, as the defense's eighth witness. The State's suggestion that the defense could have

-46-

provided the test data to Dr. Schacht when it was received on Monday morning so that he could have spent time reviewing it prior to testifying is supported by the record.

The defendant has not demonstrated that any prejudice resulted from the denial of the requested continuance. Accordingly, we conclude that the trial court did not err in proceeding with the matter as scheduled.

**VII.** **The trial court erred in failing to grant the defendant's challenge to the constitutionality of capital punishment.**

**A. Death imposed by electrocution, or by any means, is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Tennessee Constitution.**

The defendant's argument that the death penalty by any means, but in particular by electrocution, constitutes cruel and unusual punishment in violation of the state and federal constitutions has been repeatedly rejected by our appellate courts. See State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000), cert. denied, 532 U.S. 907, 121 S. Ct. 1233, 149 L. Ed. 2d 142 (2001); State v. Pike, 978 S.W.2d 904, 925 (Tenn. 1998), cert. denied, 526 U.S. 1147, 119 S. Ct. 2025, 143 L. Ed. 2d 1036 (1999); State v. Nesbit, 978 S.W.2d 872, 902-03 (Tenn. 1998), cert. denied, 526 U.S. 1052, 119 S. Ct. 1359, 143 L. Ed. 2d 520 (1999); State v. Vann, 976 S.W.2d 93, 118 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999); State v. Blanton, 975 S.W.2d 269, 286 (Tenn. 1998), cert. denied, 525 U.S. 1180, 119 S. Ct. 1118, 143 L. Ed. 2d 113 (1999); State v. Cribbs, 967 S.W.2d 773, 796 (Tenn.), cert. denied, 525 U.S. 932, 119 S. Ct. 343, 142 L. Ed. 2d 283 (1998); State v. Cauthern, 967 S.W.2d 726, 751 (Tenn.), cert. denied, 525 U.S. 967, 119 S. Ct. 414, 142 L. Ed. 2d 336 (1998).

The defendant's argument focuses on the "torturous" nature of electrocution. Under the law as amended, however, the defendant is subject to death by lethal injection, unless he elects instead to be electrocuted. Tenn. Code Ann. § 40-23-114(a), (c) (Supp. 2000). Accordingly, the "issue of whether electrocution is cruel and unusual punishment is no longer properly before the Court." State v. Morris, 24 S.W.3d 788, 797 (Tenn. 2000), cert. denied, 531 U.S. 1082, 121 S. Ct. 786, 148 L. Ed. 2d 682 (2001). With respect to death by lethal injection, the defendant adds that it is only an assumption that death by lethal injection is nontorturous.

This assignment is without merit.

**B. Tennessee Code Annotated section 39-13-204 does not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for a sentence of death in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution.**

The defendant argues that the sentencing scheme in this state fails to "provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not." State v. Pritchett, 621 S.W.2d 127, 138 (Tenn. 1981). In particular, the defendant asserts that the statutory aggravating circumstances set forth in section 39-13-204(i) fail to sufficiently limit the jury's discretion or provide a "meaningful basis" for narrowing the class of defendants eligible to receive the death penalty.

The State responds, and we agree, that only the section 39-13-204(i)(2) aggravator (prior felony conviction involving the use of violence) was applied in the defendant's case and that the use of this aggravator has been repeatedly upheld. See State v. Caldwell, 671 S.W.2d 459, 465 (Tenn.), cert. denied, 469 U.S. 873, 105 S. Ct. 231, 83 L. Ed. 2d 160 (1984).

This assignment is without merit.

**C. Tennessee Code Annotated section 39-13-204 does not sufficiently limit the exercise of the jury's discretion because once the jury finds aggravation, it can impose a death sentence no matter what mitigation is shown, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution.**

The State responds that this argument has previously been rejected. See State v. Smith, 857 S.W.2d 1, 21-22 (Tenn.), cert. denied, 510 U.S. 996, 114 S. Ct. 561, 126 L. Ed. 2d 461 (1993); State v. Hurley, 876 S.W.2d 57, 68-69 (Tenn. 1993), cert. denied, 513 U.S. 933, 115 S. Ct. 328, 130 L. Ed. 2d 287 (1994). Moreover, a reading of section 39-13-204(f)(2) reveals that the jury is by law required to impose a sentence other than death if it finds that the proven statutory aggravating circumstances do not outweigh any mitigating circumstance(s) beyond a reasonable doubt.

This assignment is without merit.

**D. Tennessee Code Annotated section 39-13-204 mandatorily requires the jury to impose the death penalty if it finds the aggravating circumstances outweigh the mitigating circumstances, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution.**

The defendant asserts that the capital sentencing scheme and section 39-13-204(g), in particular, preclude the jury from ultimately determining whether death is the appropriate punishment in a particular case because it mandates that the death sentence be imposed if the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt.

The State counters that this argument has been repeatedly rejected and is without merit. Specifically, our supreme court has repeatedly held that "'the statute, taken in its entirety, does not in any way unconstitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the Constitution.'" State v. Bane, 853 S.W.2d 483, 488 (Tenn. 1993) (quoting State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990), cert. denied, 498 U.S. 1074, 111 S. Ct. 800, 112 L. Ed. 2d 861 (1991)).

This assignment is without merit.

**E. Tennessee Code Annotated section 39-13-204 does not inform the jury in specific terms of its ability to impose a life sentence out of mercy, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution.**

The defendant argues that the failure to specifically instruct the jury that they could have chosen to sentence him to life out of pure mercy presents a "serious constitutional infirmity" in our statute.

Our appellate courts have consistently rejected the argument that the "mercy instruction" is required at a capital sentencing hearing. See Cauthern, 967 S.W.2d at 749; State v. Bigbee, 885 S.W.2d 797, 813-14 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 269 n.6 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743, 130 L. Ed. 2d 644 (1995).

This assignment is without merit.

**F. Tennessee Code Annotated section 39-13-204 prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 1, Sections 8, 9, 10, and 16 of the Tennessee Constitution.**

The defendant argues that the statute allows a jury to labor under the mistaken impression that their failure to reach a unanimous decision in the penalty phase will result in a retrial of the entire case. He cites two Louisiana cases in support of his argument that it is reversible error not to inform a capital jury that their inability to reach a unanimous verdict of death results in the mandatory imposition of a life sentence. State v. Loyd, 459 So. 2d 498, 500-02 (La. 1984); State v. Williams, 392 So. 2d 619, 634-35 (La. 1980).

Section 39-13-204(h) provides, in pertinent part, that "[t]he judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on the effect of the jury's failure to agree on a punishment." While acknowledging this statute, the defendant contends that not explaining the effect of a hung jury to a jury is an illogical and unconstitutional practice. The State correctly observes that our supreme court has repeatedly rejected this argument. See Cribbs,

967 S.W.2d at 796 (appendix); State v. Hall, 958 S.W.2d 679, 718 (Tenn. 1997), cert. denied, 524 U.S. 941, 118 S. Ct. 2348, 141 L. Ed. 2d 718 (1998); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.), cert. denied, 513 U.S. 1020, 115 S. Ct. 585, 130 L. Ed. 2d 499 (1994).

This assignment is without merit.

## PROPORTIONALITY REVIEW

**I.** **The evidence presented in its entirety and as contained in the record was insufficient as a matter of law to support a sentence of death.**

The defendant argues that the death sentence in his case is disproportionate when a comparison of the penalties received by other defendants in similar cases is undertaken as mandated by Tennessee Code Annotated section 39-13-206. That section provides that this court shall consider whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D).

In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997), cert. denied, 524 U.S. 941, 118 S. Ct. 2348, 141 L. Ed. 2d 718 (1998). In choosing and comparing cases, many variables are considered. State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citing State v. Bland, 958 S.W.2d 651, 667 (Tenn. 1997)), cert. denied, 526 U.S. 1089, 119 S. Ct. 1501, 143 L. Ed. 2d 654 (1999). Among these variables are: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Id. (citing Bland, 958 S.W.2d at 667; Hall, 958 S.W.2d at 699).

Characteristics relevant to a comparison of defendants include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. Bland, 958 S.W.2d at 667.

Focusing on the fact that he was not the shooter, the defendant argues that the evidence in this case does not support the imposition of death under the rationales announced by the United States Supreme Court in Tison v. Arizona, 481 U.S. 137, 157-58, 107 S. Ct. 1676, 1688, 95 L. Ed. 2d 127 (1987), and Enmund v. Florida, 458 U.S. 782, 797, 102 S. Ct. 3368, 3377, 73 L. Ed. 2d 1140 (1982). In Enmund, the defendant was convicted of felony murder for his role as the driver of the

getaway car in a robbery/murder of two persons in their home.  In reversing the judgment sentencing the defendant to death, the Supreme Court stated:

> For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt.  Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts. . . . .
>
> Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion.

Enmund, 458 U.S. at 801, 102 S. Ct. at 3378-79, 73 L. Ed. 2d at 1154.

Five years after Enmund, the Supreme Court further analyzed and refined the standard for imposing the death penalty upon a non-killing accomplice in Tison v. Arizona.  In that case, the petitioners assisted their brother in breaking their father and another convict out of a state penitentiary.  The petitioners received death sentences for felony murder after the occupants of a passing vehicle were kidnapped and eventually killed by the petitioners' father and his fellow escapee.  The Tison Court observed:

> The petitioners' own personal involvement in the crimes was not minor, but rather, as specifically found by the trial court, "substantial."  Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight.

481 U.S. at 158, 107 S. Ct. at 1688, 95 L. Ed. 2d at 144.  The Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement."  Id. (footnote omitted).  Our supreme court looked to the decisions in both Tison and Enmund in rejecting the claim of the non-shooter/defendant that the death penalty in his case was disproportionate in State v. Taylor, 774 S.W.2d 163, 167 (Tenn.), cert. denied, 493 U.S. 945, 110 S. Ct. 355, 107 L. Ed. 2d 342 (1989).  The court observed:

Contrary to defendant's contention, the Eighth Amendment to the United States Constitution does not bar the death penalty for an aider and abettor where the proof shows that that person intended that a killing take place or was a major participant in the underlying felony and had a mental state of reckless indifference to human life. See Tison v. Arizona, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987); Enmund v. Florida, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982). Defendant's actions before, during and immediately after the murder cast him in the role of a major participant with an affirmative intention to terminate a human life.

Id. at 166-67.

The State submits that the facts of this case show that this defendant was also a major participant in the felony murder and exhibited a reckless disregard for the victim's life. The State notes that it was the defendant who first pointed out Loveday as a potential victim and instructed the driver of the car to turn around and approach him; that the defendant and another person exited the vehicle, armed with weapons; that the defendant pointed his gun at the victim and demanded that the victim turn over his money; that it was the gun taken from the defendant's hand that was used by another to shoot the victim; that the defendant did not attempt to assist the victim after he was shot although the shooting took place next to a pay phone; and that the defendant assisted two of his accomplices, including the shooter, in fleeing police as their car was pursued on the night of the murder.

As similar cases supporting a conclusion that the death sentence is not disproportionate, the State cites the following: State v. Harris, 919 S.W.2d 323, 331-32 (Tenn. 1996) (defendant was with other men who shot and killed victim) (On direct appeal, this court modified judgment to life imprisonment; Tennessee Supreme Court reversed and remanded for "a resentencing hearing in which the State will be free to again seek the death penalty."); Taylor, 774 S.W.2d at 165 (Defendant was non-shooter, but provided murder weapon to shooter shortly before the killing.); State v. Dicks, 615 S.W.2d 126 (Tenn.), cert. denied, 454 U.S. 933, 102 S. Ct. 431, 70 L. Ed. 2d 240 (1981) (Co-conspirator apparently killed victim in robbery-turned-murder case; both he and defendant received death sentences in separate trials.); see also State v. McKay, 680 S.W.2d 447 (Tenn. 1984) (Twenty-five-year-old defendants, in separate trials, were convicted of felony murder and sentenced to death for shooting two store clerks to death during course of a robbery; evidence did not absolutely establish identity of the shooter; jury imposed death sentence in each case.).

Based upon our review of similar cases, we respectfully disagree with the defendant's argument that the evidence in this matter does not support imposition of capital punishment.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgments of conviction and the imposition of capital punishment.

_____
ALAN E. GLENN, JUDGE